

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EJK:HLJ                          *271 Cadman Plaza East*
F.#2010R01754                    *Brooklyn, New York 11201*

                                 June 17, 2011

<u>By Hand Delivery and ECF</u>

The Honorable Carol B. Amon
Chief United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:   United States v. Wenhai Liu
                      <u>Criminal Docket No. 10-772 (CBA)</u>

Dear Chief Judge Amon:

        On February 10, 2011, defendant Wenhai Liu pleaded
guilty before Your Honor, pursuant to a plea agreement, to Count
Three of the above-captioned indictment.  Count Three charges Liu
with conspiracy to take a hostage in violation of Title 18,
United States Code, Section 1203.  The government hereby submits
this response to the defendant's letter, dated June 8, 2011,
("Ltr.") seeking a sentence below the applicable advisory United
States Sentencing Guidelines ("U.S.S.G" or the "Guidelines")
range based on his young age, personal history and
characteristics.

        In addition to the defendant's June 8, 2011 letter, the
government is in receipt of the Pre-Sentence Investigation Report
("PSR") dated May 18, 2011. For the reasons set forth herein,
the government submits that a non-Guidelines sentence may be
reasonable in this case in light of all of the factors under 18
U.S.C. § 3553(a).

I.   <u>The Offense Conduct</u>

        On September 10, 2010, Liu was arrested in Brooklyn,
New York by Federal Bureau of Investigation ("FBI") agents who
were investigating the abduction of a Chinese national, Gongjie
Geng, a.k.a. "George," (also referred to herein as "the victim")
who was being held for a $3.5 million ransom.  Liu was arrested
with his co-defendant Peng Wang, shortly after being dropped off
by his co-defendant Shi Xin Li at a subway stop in Brooklyn.  At
the time of his arrest, Liu possessed the victim's passport.  Li

was arrested shortly thereafter and agreed to assist law enforcement, identifying the victim and providing the location where he was being held in Queens, New York.  Law enforcement proceeded to that location, where they rescued the victim and arrested co-defendants Yunxin Lin, Jai Wei Xu and Chen Qing Zhang.  Lin was posing as another kidnaping victim, and Xu and Zhang had been acting as guards.

        The idea to kidnap the victim was hatched months prior to the actual abduction by defendants Li and Lin, who knew the victim socially and had learned that the victim came from a wealthy family in China.[1]  Li then recruited defendant Peng Wang, who in turn recruited Xu, Zhang and Liu.  As noted in the PSR, the plan to kidnap the victim solidified around the belief that the victim's father would be traveling to the United States in September 2010, which would enable easy payment of the ransom money.  PSR ¶ 5.  In addition to recruiting the other participants, Lin and Li undertook significant planning in preparation for the kidnaping.  Among other things, they rented an apartment to hold the victim on Maple Street in Queens ("Maple Street Apartment"), purchased a Taser gun to subdue him and SIM cards to make calls to China, and held meetings to discuss their plans with Wang, Liu, Xu and Zhang at a bar and at the Maple Street Apartment.  In addition, Lin, Liu, Wang, Xu and Zhang followed the victim and set up watch outside the victim's girlfriend's apartment in the days prior to the actual abduction.

        The abduction took place on September 7, 2010, when Lin convinced the victim to meet him for breakfast in Queens to discuss repaying a loan the victim owed Lin.  PSR ¶ 6.  After breakfast, Lin and the victim walked to an empty nearby bar to which Liu had keys.  Wang, Liu, Xu and Zhang were waiting there. When Lin and the victim entered a back room of the bar, the victim was attacked by Zhang and Xu, while Liu pretended to attack Lin to make it appear as if he was a victim as well. During the attack, Zhang hit and punched the victim in the face and body, and Xu used the Taser on him multiple times.  The victim pretended to pass out after the first time he was Tasered, hoping he would be robbed and left, but he was then Tasered again, which caused him to scream in pain.  PSR ¶ 7.  The victim was then blindfolded, bound and transported to the Maple Street Apartment, where Li was waiting as a look out.  PSR ¶ 8.

---

        [1]    Both Li and Lin made post-arrest statements in which they each identified the other as the person who had initially raised the idea of kidnaping the victim.

Over the next four days, the defendants made ransom calls to the victim's family demanding $3.5 million dollars for his safe return.  The calls were made on cellular phones from Li's BMW using prepurchased SIM cards in an attempt to avoid potential law enforcement efforts to trace the calls to either their physical location or cellular phones.  Li made the first call to the defendant's father, who thought the call was a prank. Lin, Wang and Liu made subsequent calls to the defendant's mother, always in the presence of Li, who was driving the others in his BMW.  On one occasion, a three-way call was set up in which Lin called the defendant's family in China on one phone and Li called the other defendants who were with the victim at the Maple Street Apartment on another phone, and the two phones were held together so that the victim and his mother could communicate.  During this call, the victim was forced to speak with his mother and beg for his life while an apple corer (which the victim believed was a knife because he was blindfolded) was held to his neck.  PSR ¶¶ 8-9.

During the calls the defendants[2] made statements to the victim's mother such as, "Please don't try to play tricks with me. I want $3.5 million dollars.... If your son's life is as worthless as mine, then it's up to you.  But I think you should think about it yourself."  In a subsequent call one of the defendants demanded that the victim's mother bring the $3.5 million to New York herself within 24 hours.  When she asked for more time, one of the defendants said, "No.  Otherwise, you come to pick up the dead body! Ok? Your son!"  In another call the victim's mother asked again for more time to get her passport in order and to travel to the United States and asked the defendants not to harm her son.  In response one of them said, "If you are cooperated [sic] then I will take care of your son.  If you are not cooperated [sic], then I will abuse him to death little by little."  In another call the victim's mother explained that she was having trouble collecting the full $3.5 million.  One of the defendants responded, "Let's do it this way.  I am not going to feed your son.  He is in a warehouse all alone.  From now on, I will give him food only when you send me the money.  Okay? ... If you don't want him to starve to death, you should get the money as soon as possible."

Notwithstanding the above-noted ransom calls, the government's investigation suggests that the defendants never intended to use deadly force against the victim.  Nevertheless,

_____

[2]    The government has been unable to determine which defendant is speaking on each of the recorded calls.

they did beat him, keep him blindfolded and detained, and scare him.  Moreover, their threats were taken seriously by the victim's family.  The family was preparing to send the ransom money at the time the victim was rescued.

Li, Lin, and Liu also looked for a second apartment to rent after it became clear it would take longer than planned to obtain the ransom money.  Liu used a fake ID to secure the apartment.  Lin, Liu, Wang, Xu and Zhang moved the victim to this second apartment the third night after his abduction.

Finally, the investigation revealed that after their arrests, the defendants discussed Lin taking the blame in exchange for financial compensation from the other defendants.

Upon his arrest, Liu initially denied any involvement in the offense.  Later, Liu retracted those statements and admitted his involvement in executing the kidnaping scheme. Notwithstanding the violent behavior noted above, Liu's role in the scheme was limited.  He was essentially hired muscle and followed the directions of others.  He did not exercise supervisory or managerial authority over other individuals during the course of the conspiracy, nor did he recruit other individuals to join the conspiracy.

II.  The Legal Standard

In the Supreme Court's opinion in United States v. Booker, 543 U.S. 220, 245 (2005), which held that the Sentencing Guidelines are advisory rather than mandatory, the Court made clear that district courts are "require[d] . . . to consider Guidelines ranges" in determining sentences, but may tailor sentences in light of other statutory concerns.  See 18 U.S.C. § 3553(a).  In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall, 552 U.S. at 49-50 (citation omitted). Next, a sentencing judge should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  Id. (citation and footnote omitted).

III.  <u>Sentencing Arguments</u>

    A.  <u>Objections to the PSR</u>

        1.  Two-Level Enhancement for "Serious Bodily Injury"
            Pursuant to U.S.S.G. § 2A4.1(b)(2)(B) Should Not
            <u>Apply</u>

      The government notes that the two-level enhancement for
"serious bodily injury" pursuant to U.S.S.G. § 2A4.1(b)(2)(B)
should not apply under the facts in this case.

      "Serious bodily injury" is defined by U.S.S.G. § 1B1.1,
Application Note, as "injury involving extreme physical pain or
the protracted impairment of a function of a bodily member,
organ, or mental faculty; or requiring medical intervention such
as surgery, hospitalization, or physical rehabilitation."
U.S.S.G. § 1B1.1., Application Note 1(L).

      The defendants punched, hit and Tasered the victim
multiple times when they abducted him, causing him to bleed and
experience pain.  They then blindfolded him and wrapped his hands
in duct tape.  The defendants later threatened him by holding a
sharp apple corer to his neck.  PSR ¶¶ 7 and 9.  Though they kept
him blindfolded, they unbound his hands and provided him with
food and water during his captivity.  Upon the victim's rescue he
was taken to the hospital to undergo medical evaluation, where it
was determined that he sustained several cuts and contusions on
his face and body, but that he did not suffer from any major
life-threatening injuries or require any surgery or stitches.
PSR ¶ 12.

      Although the Probation Department cites to <u>Andres v.</u>
<u>United States</u>, No. 97 Civ. 3246, 2001 WL 290053, at *3 (S.D.N.Y.
March 26, 2001) in support of application of the enhancement,
traditionally courts in this and other circuits have imposed the
"serious bodily injury" enhancement only in cases that involved
severe or egregious physical harm or that required medical
intervention such as stitches, surgery and/or hospitalization.
<u>See</u> <u>United States v. Sabhnani</u>, 599 F.3d 215, 226, 252-52 (2d Cir.
2010) (serious bodily injury enhancement applied where defendants
chronically abused their maid by throwing boiling water on her,
beating her with a broom, umbrella and rolling pin, mutilating
her ears, and cutting her with a knife); <u>United States v. Joseph</u>,
No. 01-1450, 2002 WL 1275125, at *2 (2d Cir. Jun. 10, 2002)
(upholding serious bodily injury enhancement where victim was
struck over the head with a hammer and required hospitalization);
<u>United States v. Davis</u>, No. 01-1521, 2002 WL 31218263, at *1 (2d
Cir. Oct. 2, 2002) (upholding serious bodily injury enhancement

where victim's injuries included gunshot wounds requiring medical
intervention and pistol whipping causing extreme physical pain);
United States v. Wei, 164 F.3d 620, at *4 (2d Cir. 1998) (summary
order) (upholding serious bodily injury enhancement where the
victims were beaten by guards wielding guns, clubs and exercise
boards, such that one victim suffered a dislocated shoulder, one
a broken hand, and another was stomped on and beaten so severely
he coughed up blood); see also United States v. Garza-Robles, 627
F.3d 161, 164-65 (5th Cir. 2010) (upholding serious bodily injury
enhancement were victim was kicked, punched, beaten with two-by-
fours across his bare buttocks, sliced behind the ear with
razors, had a gun shoved in his mouth and had guns fired close to
his ears); United States v. Jordan, 331 Fed. App'x 696, 697 (11th
Cir. 2009) (upholding serious bodily injury enhancement were
victim suffered nerve damage); United States v. Rodgers, 122 F.3d
1129, 1132 (8th Cir. 1997) (upholding serious bodily injury
enhancement where defendant attempted to kill the victim and
where the victim's injuries required hospitalization and mental
rehabilitation and caused the impairment of mental faculties).

        In Andres, a case in which the petitioner sought post-
conviction relief under 28 U.S.C. § 2255, the court approved the
district court's imposition of the enhancement because the
defendants' treatment of the victims, who were "handcuffed,
hogtied, kicked, and threatened with death at gunpoint," imposed
"extreme physical pain" on the victims.  2001 WL 290053, at *3.
However, the Second Circuit has typically found "extreme physical
pain" only where the victim suffered egregious or intolerable
pain, or pain requiring medical attention.  See, e.g., United
States v. Wei, 373 Fed. App'x 121, at *1 (2d Cir. Apr. 29, 2010)
(defendant caused the victim "extreme physical pain" where the
defendants sprayed the victim with a blinding liquid and beat him
so severely he lost consciousness and required stitches).  While
not wanting to minimize the serious violence to which the
defendants subjected the victim in this case, the government
respectfully submits that such harm did not rise to the level of
serious bodily injury as defined by the Guidelines.  The victim
did not lose consciousness when he was beaten and Tasered, and
though he was taken to the hospital when he was rescued, he was
released the same day and did not require stitches or other
professional medical treatment, or suffer any protracted or
permanent harm, such as scarring or the impairment of physical
organs.  Accordingly, the government submits that the two-level
enhancement for "serious bodily injury" does not apply to the
defendant's Guidelines calculation.

2.   <u>Offense Level Computation</u>

In light of the foregoing, the government submits that the defendant's total offense level should be a level 35, not a level 37 as reflected in the PSR.  PSR ¶ 39.  The parties agree that the defendant falls within Criminal History Category I. Accordingly, his applicable Guidelines Range is 168-210 months' imprisonment.

B.   <u>The Defendant's Motion for a Below-Guidelines Sentence</u>

The defendant urges the Court to impose a below-Guidelines sentence based on 18 U.S.C. § 3553(a).  Specifically, he argues for a non-Guidelines sentence based on the fact that he was only 18 years old at the time of the offense.  Ltr. at 1-2.

The defendant's participation in this violent and shocking crime commands a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment and affords adequate deterrence.  This crime involved significant planning and forethought.  Moreover, the victim could have been injured much more seriously than he was.  In addition, the government rejects the defendant's contention that his conduct was "inevitable" given his age, lack of education and employment prospects.  Ltr. at 1.  The defendant had a choice about whether to participate in this violent crime, and he decided to do so knowingly and intentionally.  Nevertheless, the government agrees with the defendant and Probation that the defendant's youth may be a mitigating factor here and that a just and reasonable sentence in this case may be one that falls below the applicable Guidelines range.  The government submits, however, that any such variance below the Guidelines range should be modest.

8

IV.  <u>Conclusion</u>

       For the above-stated reasons, the government submits that a sentence somewhat below the Guidelines may be reasonable in this case.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:        /s/
Hilary Ley Jager
Assistant United States Attorney
(718) 254-6248

cc:  Clerk of Court (CBA) (by ECF)
     Benjamin L. Herzweig, Esq. (by ECF)
     Shayna Bryant, U.S. Probation (by email)
     Leslie Lockwood, U.S. Probation (by email)